Matter of B.D. (2006 NY Slip Op 51319(U))

[*1]

Matter of B.D.

2006 NY Slip Op 51319(U) [12 Misc 3d 1180(A)]

Decided on June 29, 2006

Family Court, Queens County

DePhillips, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 29, 2006

Family Court, Queens County
In the Matter of the Application of OHEL CHILDREN'S HOME AND FAMILY SERVICES For the Guardianship and Custody of B.D. and J.W., Dependent Children Under the Age of 14 Years, Pursuant to the Provisions of Section 384-b of the Social Services Law of the State of New York.
XXXX

Guy P. DePhillips, J.
By petitions filed on October 22, 2002, the petitioner, OHEL Children's Home and Family Services (OHEL), an authorized agency within the meaning of Social Services Law §371(10), commenced these proceedings seeking an order committing the guardianship and custody of the children, B.D., born in 1999 and J.W., born in 1994, jointly to OHEL and the Commissioner of Social Services of the City of New York. With respect to the respondent mother, each petition alleges that she permanently neglected the subject children within the meaning of Social Services Law §384-b(7)(a) and that she suffers from a mental illness within the meaning of Social Services Law 384-b(6). Specifically, each petition alleges, inter alia,:
 "That D.W. suffers from a mental illness as defined in Section 384-b 6(b) of the Social Services Law of the State of New York. She has been diagnosed with schizoaffective disorder, borderline personality, depression, and paranoia. The mother continues to suffer from mental illness and as a result of this condition the mother is presently and will be for the foreseeable future unable to provide proper and adequate care for the child and if the child were returned to her custody the child would be in danger of becoming a neglected child as defined by the Family Court Act." and that,

 "For more than one year following the child's placement in foster care, and notwithstanding petitioner's diligent efforts, the mother of the child has permanently neglected the child in that she has failed to substantially plan for the future of the child, although physically and financially able to do so."
 The petitions further allege that the natural father of the child J.W. is unknown and that the natural father of the child B.D. is Bienvenido D., and this petition further alleges that:
 "The natural father, Bienvenido D., has abandoned his child in that he has evinced an intent to forego his parental rights and obligations by his failure to visit the child and to communicate with the child, although able to do so and not prevented or discouraged by the agency from doing so. The said abandonment has continued for a period of time in excess of six (6) months immediately proceeding the filing of this petition."
 Extensive fact-finding and dispositional hearings were conducted upon the instant petitions, commencing on February 9, 2005 and concluding on May 17, 2006 at which time this Court reserved decision. OHEL first presented the testimony of Dr. Christopher Mongeau, a psychologist and the Associate Director of the Queens Family Court Mental Health Services Clinic, who was declared an expert witness in forensic psychology. Dr Mongeau testified that based upon his review of relevant clinical and hospital records, which included previous reports of evaluations which had been conducted by George Schumacher, PhD and Deborah Kaiser, PhD, medical records concerning the respondent, as well as his interview with the respondent, he diagnosed her as suffering from a chronic mental disorder characterized by impaired personal and interpersonal functioning. The Court's Exhibit 1 in evidence, Dr. Mongeau's clinical report (FET) of the examination date of March 20, 2003, lists an Axis I diagnostic impression of a history of major depressive disorder, recurrent, and an Axis II diagnostic impression of a borderline personality
disorder. Dr. Mongeau further states in his report that the mother's deficits are most notable in
significant internal emotional dysfunction, with emotional liability and instability of mood, exacerbated under periods of stress with full blown depressive episodes, angry outbursts, and suicidal behavior. Additionally, she has demonstrated an inability to perceive needs beyond her own, including those of the children, and severe deficits in an ability to show empathy. Dr, Mongeau concludes in his report that the respondent mother's parental capacity has been significantly impacted by her personality and emotional deficits, and that her parental capacity remains impaired despite her completion of parenting skills and involvement in counseling. Dr. Mongeau also notes that the mother's current level of insight into her deficits remains at best only superficial, and she has demonstrated no change despite her involvement in psychotherapy and use of medication, and his prognosis for consistent recovery is poor.
 Dr. Mongeau testified that he agreed with prior the diagnosis of a major depressive disorder, but that the respondent mother does not necessarily suffer from a schizoaffective disorder. Dr. Mongeau also testified that this Axis I diagnosis, major depressive disorder, may be treatable with the use of additional medication. The Axis II diagnosis, borderline personality disorder, was confirmed by his review of the records of the mother's medical history. Dr. Mongeau's testimony indicated that while the mother's borderline personality disorder may be treatable with medication and psychotherapy, it is not curable. The doctor concluded that in light of the fact that the mother's condition is treatable but not curable, her ability to care for the children is impaired by her mental condition and, within a reasonable degree of clinical certainty the subject children , if returned to her [*2]care now or in the foreseeable future, would be at risk of becoming neglected.

 Petitioner's Exhibit 1 in evidence was a psychiatric evaluation report prepared by Robert J. Kaplan, M.D. dated December 30, 2003. Dr. Mongeau testified that he had reviewed Dr. Kaplan's
psychiatric evaluation of the respondent mother, and that he saw no conflict between his and Dr. Kaplan's diagnosis that the mother suffers from a major depressive disorder, but disagreed with Dr. Kaplan's opinion that the disorder was in "partial remission". Additionally, Dr. Mongeau testified that in his opinion although the mother has been maintaining herself, has paying her bills in a timely fashion, had completed a parenting skills class, and had been generally cooperative, placing a homemaker into the home would not necessarily obviate the subject children from being at risk due to the mother's mental disorder.
 At the conclusion of Dr. Mongeau's testimony, the respondent mother called Dr. Kaplan as her first witness. Dr. Kaplan is a psychiatrist and was employed as a Family Court Psychiatrist for the Queens, Kings, Bronx, and Manhattan Family Court Mental Health Services Clinics from 1986 through 1994, and was declared an expert witness in psychiatry. Dr. Kaplan prepared his psychiatric evaluation report based upon the following sources of information: diverse records provided by the respondent mother which, the doctor admitted, were not particularly useful, the FET report dated March 20, 2003 prepared by Dr. Mongeau, and a two hour and thirty-five minute office evaluation of the respondent mother. Dr. Kaplan did not have the opportunity to review the mother's hospital records.
 Dr. Kaplan's report lists an Axis I diagnosis of dysthymic disorder, early onset, and a major depressive disorder, recurrent, in partial remission. Unlike Dr. Mongeau, Dr. Kaplan found no Axis II diagnosis, specifically, Dr. Kaplan testified that there did not appear to be a grounds for an Axis
II diagnosis of borderline personality disorder, and that nothing in his evaluation suggested such a diagnosis. Additionally, Dr. Kaplan testified that the mother had a past history of recurrent major depression, although not currently depressed, that borderline personality disorder could only be
substantiated when she was depressed, and that the respondent mother denied recent suicidal ideation. The mother had also indicated to Dr. Kaplan that she is seeking the assistance of a homemaker which Dr. Kaplan indicates in his report, along with the use of new antidepressant, would serve to ward off depression.
 Dr. Kaplan further testified that the respondent mother presented as an intelligent and articulate woman with a reasonably good command of language. There was no paranoid thinking, no hallucinations or delusions, nor anything else to suggest psychosis.
 At the conclusion of Dr. Kaplan's testimony all sides rested at fact-finding. This Court found by clear and convincing evidence that the respondent mother suffers from a mental disorder to the extent that the subject children, if returned to her care now or in the foreseeable future, would be at risk of being neglected. The Court may, in its discretion, dispense with a dispositional hearing upon a fact-finding of mental illness in a termination of parental rights proceeding, however, the term "termination of parental rights" implicates the permanent severing [*3]of both the legal relationship of parent to child as well as child to parent. Thus, a proceeding to terminate parental rights does not merely call for a custody determination, rather, the determination to terminate parental rights in the civil area is the jurisprudential equivalent of capital punishment in the criminal area, and that due process for the parent needs to be recognized as due process for the child. The Court must be mindful that in terminating the parental rights of the parent to the child, the Court is also terminating
the child's rights to the parent. In light of the dynamic nature of the mother's illness, this Court, in an exercise of it's discretion, scheduled this matter for a dispositional hearing.
 At the dispositional hearing Nancy Duggan, PH.D. gave testimony as the Court's first witness, and Dr. Duggan's Curriculum Vitae was marked as the Court's Exhibit I in evidence. Dr.
Duggan has been a practicing forensic psychologist since 1994, and was declared an expert witness in forensic psychology. Dr. Duggan's psychological evaluation report dated October 5, 2005 was marked as the Court's Exhibit III in evidence, and her addendum to this report dated January 10, 2006 was marked as the Court's Exhibit IV in evidence. The sources of data for this report and the addendum were the psychological evaluation report by Dr. Kaplan dated December 30, 2003, a psychological report dated July 22, 2001 by George Schumacher, PH.D., two interviews with the mother, two parent-child observations, an interview with B.D., an interview with J.W., various psychological tests, as well as numerous clinical and hospital records.
 Dr Duggan testified that B.D. is a special needs child who has been in foster care since birth, and who appears quite troubled. B.D. is struggling with identity and abandonment issues as he does not know where he belongs, and that he has fantasized about being with his brother and mother. B.D. has been in an Orthodox foster home and is enmeshed in a religious community, where he feels that he does not belong. B.D. exhibits a lack of self confidence, distrust, and profound identity issues. Dr. Duggan also testified that B.D.'s foster family is the only family that B.D. has ever known, and although his foster mother favors strict structure, she needs guidance in handling children with special needs, such as B.D.. Dr. Duggan testified that she has concerns about B.D.'s foster home and wonders if B.D. is getting enough attention
in his foster home in light of the fact that there are five children in the home. Additionally, Dr. Duggan testified that the foster mother made derogatory statements to the child in the doctor's presence. B.D. also suffers from a poor self-image, namely, he feels that he is a "bad kid" and that he is not with his brother and grandfather because he perceives that something is wrong with him. B.D. is exhibiting severe behavioral problems including aggressive and impulsive
behavior, including self-mutilating behavior. The doctor indicated that B.D. needs long term therapy to deal with these issues, and that he is acting out because he require a higher level of care.
 Dr. Duggan's report also indicates that B.D.'s use of medication has been very helpful and that the foster mother reports that his behavior has improved since being on this medication. The doctor also testified that while the respondent mother has expressed concerns about B.D. being on medication, this is a reasonable concern, and a response that many capable parents may have when told that their child needs to be on medication.
[*4] Finally, Dr. Duggan expressed concern in her report of the possible negative effects that a termination of parental rights, and the effects of the mother not being in the children's lives, would have on B.D.. His confusions about where he belongs and his issues of rejection and abandonment could be exacerbated by his mother's complete disappearance from his life.
 Dr. Duggan testified that her recommendation with respect to J.W. is that J.W. remain with his grandfather, as the mother lacks the level of skills required and is not capable of meeting this child's needs. Additionally, Dr. Duggan's report indicates that a termination of the mother's parental rights over J.W. may not necessarily be an issue and may not have a negative effect on the mother or the child as the grandfather, Mr. W., gives and would continue to give the respondent
mother access to J.W. if she wanted it.
 With respect to the respondent mother, Dr. Duggan testified that seems to be psychiatrically
stable as long as she is compliant with medication, and noted that the mother has not needed to be hospitalized in a number of years. There was no evidence of nor did she exhibit any significant symptoms of depression, psychosis, or bipolar disorder. Any symptoms of anxiety expressed during the evaluation seemed primarily related to the stress of being evaluated. Dr. Duggan testified that
the respondent mother's improvement may continue, that she is amenable to treatment to help her depression, and that her pattern of having problems relating to others can be treated. Additionally, the mother has expressed a willingness and even a desire to have supportive services and supervision if she were to get her children back.
 The respondent mother first presented the testimony of Frantz H. Lubin, M.D. Dr. Lubin's curriculum vitae, which was marked as respondent's 1A in evidence, listed extensive experience in the field of forensic psychiatry dating back to 1985, and Dr. Lubin was declared by this Court to be an expert in psychiatry. Dr. Lubin testified that he has known the respondent mother for ten years, having first met her in a facility where the mother was a patient and he was the medical director. The doctor currently sees the mother at the Western Queens Consultation Center. In addition to his extensive experience with the mother, Dr. Lubin reviewed Dr. Mongeau's FET, Dr. Kaplan's report, Dr. Duggan's report and that report's addendum, as well as reports from two other doctors.
 Dr. Lubin testified that the mother has an Axis I diagnosis of major depression and an Axis II diagnosis of borderline personality disorder. The doctor made this diagnosis based upon the mother's feelings of hopelessness, worthlessness, and helplessness. Dr. Lubin testified, however,
that these feelings that the mother had been having have subsided significantly, and to a reasonable degree of psychiatric certainty his opinion as to why these negative feelings have significantly subsided is because the mother is now goal directed, she wants to be a mother for her children, she
became more compliant with her medications, she is able to follow treatment, and she sees her therapist regularly. Her borderline personality disorder has been successfully treated with a combination of medications and therapy, and he has seen a dramatic improvement in the respondent [*5]mother. Additionally, Dr. Lubin testified that his prognosis for the mother, to a reasonable degree of medical certainty, is that because of this dramatic improvement she has the capacity to take care of her children, and is capable of taking care of her children with proper supervision. Specifically, the doctor recommended supervision on a monthly basis, parenting skills, individual and family therapy with the same treatment team for the mother as well as for the children, and that because of the supervision by a social worker the mother would not be alone, and therefore she would have all of the supervision and capacity necessary to care for her children.
 The respondent next presented the testimony of Irina Sarsikova, LMSW. Ms. Sarsikova is a licensed social worker and was deemed an expert in the area of social work by the Court. Ms. Sarsikova has been the respondent mother's psychotherapist at the Western Queens Consultation Center since 2002, and has consistently met with the mother on a weekly basis since that time. Ms. Sarsikova testified that she works with Dr. Lubin, the mother's psychiatrist, at the Western Queens Consultation Center and that prior to that she worked with the mother's previous psychiatrist, Dr. Bernard. She consults with Dr. Lubin on the mother's treatment, which has been consistent psychotherapy sessions, and a course of medication. Ms. Sarsikova testified that she is treating the
respondent mother for a depressive disorder with supportive therapy, psychotherapy, and medication.
 Ms. Sariskova further testified that, to a reasonable degree of social work certainty, that the respondent mother's mental health condition is manageable and that she can function as a mother. Her condition has been improved dramatically, her awareness about her condition has also improved
dramatically, as well as her insight into her presenting problems and her coping skills. This improvement occurred gradually over the past year, including an improvement in maintaining her housing and dealing with various government agencies in an effective manner.
 To support a termination of parental rights on the grounds of mental illness or mental retardation, the petitioning agency must show, by clear and convincing evidence, that the parent is presently, and will, for the foreseeable future, be unable to provide proper and adequate care for the child [ren] by reason of the parent's mental illness or mental retardation ( see, Social Services Law §384-b[3][g]; [4][c]; Matter of Harris AA, 285 AD2d 755 [3rd Dept. 2001]; Matter of Donald LL, 188 AD2d 899 [3rd Dept. 1992]). The statutory direction at disposition is that an order of disposition be made solely on the basis of the best interests of the child, and there shall be no presumption that such interests be promoted by any particular disposition. Additionally, in light of the fact that a termination of parental rights denies the natural parent physical custody as well as, perhaps, the right to even visit, communicate with, or regain custody of the child, what is in the children's best interests must be proven at disposition by clear and convincing evidence. Here, what is in the best interests of one child is not necessarily in the best interests of both children.
 With respect to J.W., this Court heard testimony that J.W. is doing well in his maternal grandfather's house. He is very happy there and finds it a good place to live, and has conveyed his
strong preference to living there several times to Dr. Duggan. The academic and behavioral [*6]difficulties he experienced as a younger child are much less prevalent. He has adapted to living with his grandfather, and they have been able to work through issues that they have had in the past. J.W. is now also doing much better in school, and even the respondent mother has acknowledged that J.W. is comfortable in his grandfather's house, and that the grandfather has done a good job with J.W.. Any adoption of J.W. by his maternal grandfather, who is now his current foster parent, would be a de facto open adoption, as his maternal grandfather allows liberal access to the child J.W. by the respondent mother. While the experts who testified expressed concerns about what the effects of the respondent mother not being involved in B.D.'s life would have on B.D., those concerns would not necessarily be an issue with J.W.. The testimony and evidence adduced at the hearings, including the opinions of the experts, shows by clear and convincing evidence that it is in the best interests of the child J.W. to grant the petition. In connection with the older child, taking into account the best interests of that child, the functioning of that child, the bonding in place, and by virtue of the fact that it is de facto an open adoption situation, the best interests of the child, in connection with the hearing at disposition implicates that the burden was sufficiently carried by the petitioner and this Court therefore would terminate the mother's parental rights with respect to that child but on the clear understanding she would be maintaining a de facto relationship with that child. Thus, the petition to terminate the parental rights of the respondent mother over the child J.W. is granted, and the custody and guardianship of the child J.W. is placed with the petitioner agency.
 The evidence at the hearings also showed that B.D.'s needs are quite different than
those of J.W., and that what is in J.W.'s best interests is not necessarily what is in B.D.'s best interests.
 With respect to the younger child, this child is a most needy child. The younger child, clearly, in the Court's view, has a crisis of identity and it is demonstrated within the pages of the record that this is one of those rare cases where the best interests of the child and the best interests if the mother coincide. This child desperately needs the birth mother, he has an overwhelming need for her presence, compassion, and love. The birth mother in connection with her psychological, emotional, and mental health has demonstrated a commitment to meeting what is required with respect to her mental health needs and has always demonstrated a love for the children. This will enable the mother to be able to focus her energy primarily on the needs of the younger child. The Court notes that those who testified at the dispositional stage of these proceedings were completely credible. Accordingly, the Court has determined that the best interests of the younger child require suspended judgment for one year in connection with the instant petition.
 The respondent has demonstrated that despite her history of mental illness, she is capable, with the proper services in place, of taking care of the child B.D. presently and in the foreseeable future. Additionally, the evidence has shown that not only does the mother have an overwhelming need to have the child in her life, the child has an overwhelming need to have his biological mother in his life.
 The planning goal with respect to the older child is adoption. The planning goal for the [*7]younger child with respect to permanency is return to parent. Settle orders on notice within thirty days. With respect to the child B.D., settle order on notice setting forth the terms and conditions
of the suspended judgment as set forth on the record (see, NYCRR §205.15).

 E N T E R:

 
 GUY P. DePHILLIPS, Judge of the Family Court
DATED:JAMAICA, NEW YORK
June 29, 2006